# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN GERBA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 17-cv-7235 |
| v. ) | |
| ) | Judge Robert M. Dow, Jr. |
| NATIONAL HELLENIC MUSEUM, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

In this diversity action, Plaintiff John Gerba ("Plaintiff") brings suit against Defendant the National Hellenic Museum ("Defendant" or "Museum") for violation of the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.* ("IWA"), common law retaliatory discharge, and defamation. Currently before the Court is Defendant's motion to dismiss the complaint for failure to state a claim [12]. For the reasons explained below, Defendant's motion [12] is granted. Plaintiff is given until July 20, 2018 to file a first amended complaint to the extent that he can do so consistent with this opinion.

**I.   Background[1]**

Plaintiff is a citizen of Indiana and resides in Whiting, Indiana. Defendant is an Illinois not-for-profit corporation registered to transact business in Cook County, Illinois. Its headquarters are located in Chicago, Illinois.

Plaintiff began working for Defendant on May 24, 2016 as the Director of Finance. Within a few weeks, he was promoted to Vice President of Finance and Operations. In this role, he reported to Laura Calamos Nasir ("Nasir"). Plaintiff's duties consisted primarily of running

---

[1] For purposes of Defendant's motions to dismiss, the Court assumes as true all well-pled allegations set forth in Plaintiff's complaint. See [1-1]; *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017).

the accounting department, overseeing the human resources department, overseeing building and grounds maintenance, overseeing contracts and insurance policies, and generally overseeing Defendant's day to day operations. Plaintiff had access to non-public information regarding Defendant's financial situation, as well as the inner workings of Defendant and its politics and structure. Plaintiff's annual salary was approximately $125,000.

Around May 2016, Pat Nichols ("Nichols") served as Defendant's interim president for six weeks on a consultant basis. During that time, Nichols requested that Plaintiff provide an inventory showing how Defendant used funds from an Illinois Department of Natural Resources ("IDNR") grant to install information kiosks in the Museum. Plaintiff was unable to find an inventory list.

Around September 2016, Plaintiff suggested to Nasir and James Adams ("Adams"), the Chief Financial Officer of Calamos Family Partners, various ways to install the kiosks. Plaintiff emphasized the need to complete the project. He also requested an accounting of how Defendant spent the IDNR grant money. The requested accounting was never provided and Defendant has not installed the kiosks in the Museum.

Also in September 2016, Plaintiff discovered that Defendant had received tens of thousands of dollars in donations to purchase benches decorated with the donors' names to place in the Museum. Plaintiff alleges on information and belief that, instead of using the funds for their promised purpose, Defendant used the donor money for unrelated Museum projects. Plaintiff spoke with Nasir about the failure to use the donor money for the intended purpose of purchasing benches. He informed her continuously of the need to purchase the benches.

In October 2016, "Plaintiff became aware of and concerned about a number of alleged improprieties by Defendant, including inaccurate financial reporting, commingling of assets, and

2

misallocation of funds." [1-1] at 5. These concerns included alleged directives to falsify financial reports showing contributions by Defendant's board members, including John Calamos, Sr. ("Calamos"); misallocation and misuse of donations earmarked for educational purposes; and concerns related to Nippersink Country Club, a property that had been donated to Defendant.

Around February 2017, Defendant appeared to be running low on funds. On February 7, Plaintiff emailed Nasir and Adams to inform them that Defendant could not meet its upcoming payroll obligations. Nasir and Adams instructed Plaintiff to use a $30,000 donation, which had been earmarked for educational spending, to cover the payroll obligation. Plaintiff cautioned them against using the donation for payroll, because the money was restricted for educational spending. Nevertheless, Nasir and Adams instructed Plaintiff to deposit the $30,000 check for payroll use, but to credit the revenue to education. Plaintiff expressed discomfort in doing so and stated that he felt pressured to use the funds improperly.

Around March 2, 2017, Plaintiff requested that Adams provide him with the 2016 monthly financial statements, vendor names, and receipts for Nippersink County Club. Plaintiff also asked whether any of Defendant's board members had financial ties to Nippersink or its vendors, which could create conflicts of interest for the Museum. Plaintiff never saw any income from Nippersink Country Club on Defendant's balance sheets. At the time Plaintiff requested information from Adams, he was preparing to create a Board Contribution Report to track the 2016 contributions of each of Defendant's board members to the Museum. Adams did not provide the requested information.

Plaintiff compiled the Board Contribution Report using other financial reports and submitted it to Nasir and Adams. His report distinguished between board members' personal/individual contributions and contributions by the board members'

3

companies/organizations. This was different than how previous reports had been prepared. In those previous reports, Plaintiff alleges, Defendant had "deceptively combined the sources of funds from personal and business entities, suggesting that the single board members donated all funds personally." [1-1] at 7. Upon receiving the Board Contribution Report, Adams reprimanded Plaintiff and questioned who gave him authority to include company and foundation donations in the report. Plaintiff responded that, as the Vice President of Finance and Operations, he should be able to make that decision, which he believed had been proper. Nasir told Plaintiff that his "threats [were] wearing thin" and ordered him to fix the report to omit company and foundation donations. *Id*. Although Plaintiff made the changes that Nasir requested, he told her that he was uncomfortable doing so and it was against his better judgment, but he felt compelled to follow orders. Plaintiff also expressed that Defendant would have to replace him rather than coerce him to perform his job in a way he deemed fiscally improper. See [1-1] at 9.

On March 28, 2017, Defendant terminated Plaintiff's employment. Prior to his termination, he did not receive any warnings, disciplinary actions, write-ups, or poor performance reviews.

On June 19, 2017, Defendant's Education and Public Programs Manager, Dimitra Georgouses ("Georgouses") sought an order of protection against Plaintiff in the Circuit Court of Cook County Domestic Violence Division, Case No. 17 OP 74063. On June 21, 2017, Defendant's Director of Human Resources and Operations, Kristi Athas ("Athas"), informed Defendant's staff during an all-staff meeting that there was an active restraining order issued against Plaintiff by a Museum employee and that Plaintiff had been stalking and sending inappropriate text messages to the employee. Athas instructed staff to call the police if Plaintiff

4

was spotted on Defendant's property. In fact, a restraining order was never entered against Plaintiff. On August 7, 2017, Georgouses' motion for protective order was dismissed because she failed to appear for her hearing and abandoned her claims.

Plaintiff filed suit against Defendant in Cook County Circuit Court on August 30, 2017. In Count I, Plaintiff alleges that Defendant violated section 15 of the IWA by terminating him just weeks after he complained about reasonably perceived illegalities concerning Defendant's finances and refused to participate in activities that he reasonably believed were illegal. In Count II, Plaintiff alleges a claim for common law retaliatory discharge based on the same allegations. In Count III, Plaintiff alleges that Defendant committed defamation *per se* by informing its employees that Plaintiff had an active restraining order against him for stalking and sending inappropriate text message, emails, and voicemails to a Museum employee, when in fact a restraining order had never been entered against Plaintiff. Plaintiff alleges that this statement is defamatory *per se* because it implied that Plaintiff had committed a crime. Plaintiff further alleges that the statement is not protected by a qualified privilege and, in the alternative, that Defendant exceeded any qualified privilege because it made the false statement with an intent to injury Plaintiff and/or with reckless disregard for the truth.

Defendant removed this action to federal court on the basis of diversity jurisdiction. Currently before the Court is Defendant's motion to dismiss the complaint for failure to state claim.

**II.     Legal Standard**

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint. For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Calderon-*

*Ramirez*, 877 F.3d at 275 (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). The Court reads the complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011).

**III.    Analysis**

Plaintiff concedes that his IWA claim should be dismissed because he does not allege that he disclosed any information to a government or law enforcement agency. See [21] at 1. That leaves Plaintiff's claims for retaliatory discharge and defamation *per se*, which are discussed in turn below.

### A.    Common Law Retaliatory Discharge

Illinois' tort of retaliatory discharge "'is an exception to the general rule that an at-will employment is terminable at any time for any or no cause.'" *Tolene v. T-Mobile, USA, Inc*., 178 F. Supp. 3d 674, 686 (N.D. Ill. 2016) (quoting *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009)). To state a claim for retaliatory discharge, a Plaintiff must allege that he was "'(1) discharged; (2) in retaliation for [his] activities; and (3) that the discharge violates a clear mandate of public policy.'" *U.S. ex rel. Marshall v. Woodward, Inc*., 812 F.3d 556, 564 (7th Cir. 2015) (quoting *Darchak v. City of Chicago Bd. of Ed.*, 580 F.3d 622, 628 (7th Cir. 2009)). While "[t]here is 'no precise definition of the term' public policy," the Illinois Supreme Court "has explained that it 'concerns what is right and just and what affects the citizens of the State collectively.'" *Gomez v. Garda CL Great Lakes, Inc.*, 76 F. Supp. 3d 788, 794-95 (N.D. Ill. 2014) (quoting *Palmateer*

*v. Int'l Harvester Co.*, 421 N.E. 2d 876, 878 (Ill. 1981)). "Public policies are different from purely personal matters." *Id*. at 795 (internal quotation marks omitted). For instance, "the tort applies in situations where an employee is fired for refusing to violate a statute and not where a worker is fired over a disputed company policy." *Id*.

The identified public policy "must be found in the state's constitution, statutes or, where they are silent, in the judicial decisions of the state's courts." *Drager v. Village of Bellwood*, 969 F. Supp. 2d 971, 983 (N.D. Ill. 2013). "To survive a motion to dismiss," it is "not enough" to "cit[e] a constitutional or statutory provision"; instead, "the policy identified in the complaint must strike at the heart of a citizen's social rights, duties and responsibilities before a tort will be allowed, or involve the protection of each citizen's health and safety." *Id*. (internal quotation marks and citation omitted); see also *Long v. Commercial Carriers, Inc*., 57 F.3d 592, 595 (7th Cir. 1995). In Illinois, "[i]t is widely recognized that the existence of a public policy, as well as the issue whether that policy is undermined by the employee's discharge, present[] questions of law for the court to resolve." *Turner v. Memorial Medical Center*, 911 N.E.2d 369, 374–75 (Ill. 2009); see also *Collins v. Bartlett Park Dist*., 997 N.E.2d 821, 828 (Ill. App. 2013).

Defendant argues that Plaintiff's claim for retaliatory discharge should be dismissed because the complaint does not plausibly allege that Plaintiff's discharge violated any clearly mandated public policy impacting the collective health, safety and welfare of Illinois citizens. Instead, Defendant maintains, the grievances that allegedly motivated Plaintiff's discharge "involve[d] the internal governance and operations of the Museum, a private, not-for-profit corporation." [13] at 5. Plaintiff responds that his "complaints do not concern mere internal economic matters, but notably that Defendant violated State and Federal law through the unlawful activities of embezzlement and fraud." [21] at 5.

7

Plaintiff is correct that "[t]he great majority of courts interpreting Illinois law hold that an employee who reports unlawful conduct to an employer is protected under the tort of retaliatory discharge," even if the conduct is not reported to law enforcement. *Belline v. K-Mart Corp.*, 940 F.2d 184, 187 (7th Cir. 1991); see also, e.g., *Van Pelt v. Bona-Dent, Inc.*, 2018 WL 2238788, at *8 (N.D. Ill. May 16, 2018) (denying motion to dismiss which was based on argument that plaintiff's "retaliatory discharge fails because he reported the illegal workers and odor of gas to his supervisor, rather than to a law enforcement agency"); *Spendal v. Illinois-American Water Co.*, 2013 WL 1285593, at *3 (N.D. Ill. Mar. 27, 2013) (denying motion to dismiss retaliatory discharge claim where plaintiff alleged that she was terminated in part because she reported that other employees were operating company vehicles under the influence of alcohol, in violation of Illinois law); *Corral v. UNO Charter School Network, Inc.*, 2013 WL 1855824, at *11 (N.D. Ill. May 1, 2013) (recognizing that "the 'citizen crime-fighter approach' has emerged as a common category of retaliatory discharge claims"). This is because "public policy clearly favors the exposure of crime." *Belline*, 940 F.2d at 187.

In this case, however, it is not clear from the governing complaint that Plaintiff reported suspected *criminal* conduct to Defendant. The complaint does not allege, as Plaintiff claims in his response to the motion to dismiss, that Plaintiff told anyone that he suspected that Defendant or its employees were violating "State and Federal law" or engaging in "embezzlement and fraud." [21] at 5. Instead, the complaint alleges that Plaintiff (1) spoke to Adams and Nasir about the need to use the IDNR grant money to install kiosks, [1-1] at 5; (2) spoke to Nasir about the need to use earmarked donor money to purchase benches, *id.*; (3) cautioned Nasir and Adams about using a donation earmarked for educational spending to cover payroll and told them he felt pressured to use the funds improperly, *id.* at 6; and (4) told Nasir that it was against his better

8

judgment and fiscally improper to omit company and foundation donations from the Board Contribution Report, *id.* at 7. These pleadings suggest that Plaintiff was allegedly "fired over a disputed company policy" about how funds should be used and accounted for, *Gomez*, 76 F. Supp. 3d at 795, rather than for reporting a suspected violation of law. But this is a close call, and Plaintiff is given leave to file an amended complaint by July 20, 2018 specifying what suspected "unlawful activities" he reported to Defendant and why such activities were unlawful, such that they would violate a clear mandate of public policy. [21] at 5.

### B. Defamation *Per Se*

"An Illinois defamation action may state a claim either for defamation *per se* (statements so harmful to reputation that damages are presumed) or defamation *per quod* (statements requiring extrinsic facts to show their defamatory meaning)." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). Plaintiff's claim is based on one of the "limited categories of statements or imputations that Illinois considers actionable *per se*": the "commission of a criminal offense." *Id.* (citing *Bryson v. News Am. Pub, Inc.*, 672 N.E.2d 1207, 1214-15 (Ill. 1996)). "For a statement to constitute defamation *per se* as imputing the commission of a crime, the crime must be an indictable one, involving moral turpitude and punishable by death or imprisonment rather than by fine." *Doe ex rel. Doe v. Catholic Diocese of Rockford*, 38 N.E.3d 1239, 1251 (Ill. App. 2015).

The elements of a claim for either type of defamation are (1) the defendant made a false statement about the plaintiff; (2) the defendant made an unprivileged publication of that statement to a third party; and (3) that publication caused damages. *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1102–03 (N.D. Ill. 2016). As to the first element, "[a] statement that is not technically true in every respect but is 'substantially true' does not constitute

9

defamation; this is a question for trial unless no reasonable jury could find that substantial truth was not established." *Id*. at 1103-04 (citing *Global Relief Found., Inc. v. N.Y. Times Co*., 390 F.3d 973, 982, 987 (7th Cir. 2004)).

"A defamatory statement is not actionable if it is privileged." *Dobias v. Oak Park & River Forest High School Dist. 200*, 57 N.E.3d 551, 572 (Ill. App. 2016). Qualified privilege is an affirmative defense that may be raised in a motion to dismiss if "the defense is apparent on the face of the complaint." *Id*. An allegedly defamatory statement is subject to a qualified privilege in "(1) situations in which some interest of the person who publishes the defamatory matter is involved," "(2) situations in which some interest of the person to whom the matter is published or of some other third person is involved," and "(3) situations in which a recognized interest of the public is concerned." *Kuwik v. Starmark Star Marketing & Admin., Inc.*, 619 N.E.2d 129, 135 (Ill. 1993) (citing the RESTATEMENT (SECOND) OF TORTS, § 5.25). A defendant "may not rely on [qualified] privilege if he abuses it." *Dobias*, 57 N.E.2d at 573. "A plaintiff claiming a defendant abused a qualified privilege must show a direct intention to injure another or a reckless disregard of the plaintiff's rights and of the consequences that may result to the plaintiff." *Id*. "Reckless disregard" means publishing the allegedly defamatory matter "despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth." *Kuwik*, 619 N.E.2d at 133 (internal citation and quotation marks omitted).

Count III of Plaintiff's complaint alleges that Athas' statement to Museum staff that there was "an active restraining order issued against Plaintiff by a Museum employee, and that Plaintiff had been stalking and sending inappropriate text messages to said employee" ([1-1] at 8) was defamatory *per se* because, "[i]n fact, a restraining order had never been entered against Plaintiff and the protective order filed by Ms. Georgouses was dismissed when she failed to

10

appear for her hearing" (*id*. at 11). In its motion to dismiss, Defendant argues that the allegations are insufficient to state a claim for defamation *per se* because the allegedly defamatory statement did not include any factual statement indicating that Plaintiff had committed a crime. But in fact, the complaint expressly alleges that "Athas * * * informed [Museum] staff * * * that Plaintiff had been stalking and sending inappropriate text messages" to a Museum employee. [1-1]. This is not merely a statement that Plaintiff was *accused* of stalking, or a vague statement that Plaintiff was somehow involved in stalking charges, which distinguishes the present case from the three relied upon by Defendant, [13] at 8-9. Compare *Moore v. People for the Ethical Treatment of Animals, Inc*., 932 N.E.2d 448, 456 (Ill. App. 2010) (affirming dismissal of defamation *per se* claim where complaint contained "no positive factual statement of criminal animal cruelty to support a defamation per se claim"); *Adams v. Sussman & Hertzberg, Ltd*., 684 N.E.2d 935, 947 (Ill. App. 1997) (statement that plaintiff was "being held by police because a warrant had been issued for [his] arrest" not actionable for defamation *per se* where the statement "did not impute the commission of a crime but, rather, that the defendant had been arrested"); *Trembois v. Standard Ry. Equipment Mfg. Co.*, 84 N.E.2d 862, 866 (Ill. App. 1949) (statements that plaintiff was arrested for rape did "not impute the commission of the crime of rape or state that he is a rapist").

Defendant also contends that the term "stalking" has a broader, noncriminal meaning and therefore Athas' statement that Plaintiff was stalking a Museum employee is not actionable. However, the Court cannot say that "readers of common and reasonable understanding," *Basile v. Prometheus Global Media*, 225 F. Supp. 3d 737, 742 (N.D. Ill. 2016), would believe "stalking"—which is a Class 4 felony under Illinois law, 720 ILCS 5/12-7.3—to mean something other than the criminal act of stalking, especially when Atha's statement is taken

within the context of her informing employees that there is an order of protection against Plaintiff and telling them to call police if Plaintiff is seen at the Museum.

Nonetheless, the Court concludes that Plaintiff's allegations are insufficient to state a claim for defamation *per se*. The only part of Athas' statement that Plaintiff challenges as *false* is that "there was an active restraining order" against him, when in fact no restraining order was ever issued. Stating that there is a restraining order against Plaintiff is not the same thing as stating that he committed an underlying criminal offense, be it stalking or domestic violence, that led to the alleged victim seeking protection. Cf. *Adams*, 684 N.E.2d at 947 (stating that plaintiff was arrested does not impute commission of a crime). Plaintiff does not allege that Athas' statement that he engaged in *stalking* was false. Without this information, the complaint fails to allege that Defendant "made a false statement," *Doctor's Data*, 170 F. Supp. 3d at 1102, that Plaintiff "commi[tted] a criminal offense," *Muzikowski*, 322 F.3d at 924, as required to state a claim for that category of defamation *per se*. Again, this pleading deficiency may have been a mere oversight that is easily corrected in an amended complaint.

Although it is unnecessary to decide Defendant's alternative argument that it is protected by qualified privilege, the Court addresses it briefly. From the face of the complaint, it appears that Athas' allegedly defamatory statements might be protected by qualified privilege because the statements involved Athas' interest in maintaining the safety of Museum employees and the Museum staff's interest in a safe workplace. See *Kuwik*, 619 N.E.2d at 135. According to the complaint, Athas followed up her allegedly defamatory statement by instructing staff to call the police if Plaintiff was spotted on Museum property. Compare *Haywood v. Lucent Techs., Inc.*, 169 F. Supp. 2d 890, 916–17 (N.D. Ill. 2001) (holding that a communication that security staff should contact the police if a former employee appeared on the premises was subject to a

12

qualified privilege, because the employer, security guards, and employees had a compelling interest in knowing that the former employee was not allowed on the premises). As it stands, the complaint contains only bare-bones allegations that Defendant exceeded qualified privilege by "ma[king] the false statements with an intent to injure Plaintiff and/or with reckless disregard for the truth." [1-1] at 11. In his amended complaint, Plaintiff should consider including any facts from which it could be inferred that Athas knew that Georgouses' claims of stalking were false or had "a high degree of awareness of probable falsity" or "serious doubts as to [their] truth." *Kuwik*, 619 N.E.2d at 133.

**IV. Conclusion**

For these reasons, Defendant's motion to dismiss [12] is granted. Plaintiff is given until July 20, 2018 to file a first amended complaint to the extent that he can do so consistent with this opinion.

Dated: June 21, 2018

_____
Robert M. Dow, Jr.
United States District Judge

13