# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN GERBA, | ) |
| Plaintiff, | ) |
| | ) Case No. 17-cv-7235 |
| v. | ) |
| | ) Judge Robert M. Dow, Jr. |
| NATIONAL HELLENIC MUSEUM and DIMITRA GEORGOUSES, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

In this diversity action, Plaintiff John Gerba ("Plaintiff") brings suit against Defendant the National Hellenic Museum ("Museum") for common law retaliatory discharge (Count I) and defamation *per se* (Count II) and against Defendant Dimitra Georgouses ("Georgouses") for defamation *per se* (Count III). Currently before the Court is the Museum's motion to dismiss Counts I and II of Plaintiff's amended complaint for failure to state a claim [36]. For the reasons explained below, the Museum's motion [36] is denied.

**I.    Background[1]**

Plaintiff is a citizen of Indiana and resides in Whiting, Indiana. The Museum is an Illinois not-for-profit corporation registered to transact business in Cook County, Illinois. Its headquarters are located in Chicago, Illinois.

Plaintiff began working for the Museum in May 2016 as the Director of Finance. Within a few weeks, he was promoted to Vice President of Finance and Operations. In this role, he reported to Laura Calamos Nasir ("Nasir"). Plaintiff's duties consisted primarily of running the

---

[1] For purposes of the Museum's motion to dismiss, the Court assumes as true all well-pled allegations set forth in Plaintiff's amended complaint. See [31]; *Calderon-Ramirez v. McCament*, 877 F.3d 272, 275 (7th Cir. 2017).

accounting department, overseeing the human resources department, overseeing building and grounds maintenance, overseeing contracts and insurance policies, and generally overseeing the Museum's day to day operations. Plaintiff had access to non-public information regarding the Museum's financial situation, as well as the inner workings of the Museum and its politics and structure. Plaintiff's annual salary was approximately $125,000.

Around the time Plaintiff was hired, Pat Nichols ("Nichols") served as the Museum's interim president for six weeks on a consultant basis. During that time, Nichols requested that Plaintiff provide an inventory showing how the Museum used funds from an Illinois Department of Natural Resources ("IDNR") grant to install information kiosks in the Museum. Plaintiff was unable to find an inventory list.

Around September 2016, Plaintiff suggested to Nasir, James Adams ("Adams," the Chief Financial Officer of Calamos Family Partners) and Konstantinos Armiros ("Armiros," a Museum board member and attorney) various ways to install the kiosks. Plaintiff emphasized the need to complete the project. He also requested an accounting of how the Museum spent the IDNR grant money. Plaintiff informed Nasir and Adams that failure to use the IDNR grant money for its specified purpose would be illegal because the grant money falls under generally-accepted accounting principles ("GAAP") and Internal Revenue Service ("IRS") category of "restricted funds," meaning it must be used for its specified purpose to comply with the law. Plaintiff stated that people go to jail for such conduct, particularly because money from the IDNR was, at least in part, taxpayer money. The requested accounting was never provided and the kiosks have not been installed at the Museum.

Also in September 2016, Plaintiff discovered that the Museum had received tens of thousands of dollars in donations to purchase benches decorated with the donors' names to place

2

in the Museum. Plaintiff alleges on information and belief that, instead of using the funds for their promised purpose, the Museum used the donor money for unrelated Museum projects. Plaintiff spoke with Nasir, Adams, and Armiros about the failure to use the donor money for the intended purpose of purchasing benches. He stated that it was unlawful to spend earmarked donor money on unrelated projects and stressed that such conduct sends people to prison. Plaintiff informed Nasir, Adams, and Armiros continuously of the need to purchase the benches.

In October 2016, "Plaintiff became aware of and concerned about a number of alleged improprieties at [the Museum], including inaccurate financial reporting, commingling of assets, and misallocation of funds." [31] at 4. These concerns included alleged directives to falsify financial reports showing contributions by the Museum's board members, including John Calamos, Sr. ("Calamos"); misallocation and misuse of donations earmarked for educational purposes; and concerns related to Nippersink Country Club, a property that had been donated to the Museum and of which Plaintiff was appointed the registered agent.

Around February 2017, the Museum appeared to be running low on funds. On February 7, Plaintiff emailed Nasir and Adams to inform them that the Museum could not meet its upcoming payroll obligations. Nasir and Adams instructed Plaintiff to use a $30,000 donation, which had been earmarked for educational spending, to cover the payroll obligation. Plaintiff cautioned them against using the donation for payroll, because the money was restricted for educational spending. Nevertheless, Nasir and Adams instructed Plaintiff to deposit the $30,000 check for payroll use, but to credit the revenue to education. Plaintiff expressed discomfort in doing so and stated that he felt pressured to use the funds improperly. Plaintiff also spoke with Nasir and Adams via phone regarding the $30,000 education donation, reiterating that the money could only be spent on education and not on payroll. Nasir told him that because the entire Museum experience was about

3

education and learning, Plaintiff could use the $30,000 to meet payroll needs. Plaintiff responded that because the Museum is actually a form of entertainment, the money earmarked for education could not be spent on payroll because that would be illegal. Plaintiff further stated that if a donor asked for a report of how the $30,000 was spent, the Museum would have to show that it was spent on education, and if it could not, it would be in trouble. Plaintiff told Nasir that if a donor asked for a report of how the $30,000 was spent, he would not fabricate or forge receipts showing NHM spent the $30,000 on education when, in fact, it had not.

In early March 2017, Plaintiff requested that Adams provide him with the 2016 monthly financial statements, vendor names, and receipts for Nippersink County Club to determine if the Museum was making any money off the property. Plaintiff never saw any income from Nippersink Country Club on the Museum's balance sheets. Plaintiff also asked whether any of the Museum's board members had financial ties to Nippersink or its vendors, which could create conflicts of interest for the Museum. At the time Plaintiff requested information from Adams, he was preparing to create a Board Contribution Report to track the 2016 contributions of board members to the Museum. Adams did not provide the requested information.

Plaintiff compiled the Board Contribution Report using other financial reports and submitted it to Nasir and Adams. His report distinguished between board members' personal/individual contributions and contributions by the board members' companies/organizations. This was different than how previous reports had been prepared. In those previous reports, Plaintiff alleges, the Museum had "deceptively combined the sources of funds from personal and business entities, suggesting that the single board members donated all funds personally." [31] at 6. Upon receiving the Board Contribution Report, Adams reprimanded Plaintiff and questioned who gave him authority to include company and foundation donations in

4

the report. Plaintiff responded that, as the Vice President of Finance and Operations, he should be able to make that decision, which he believed had been proper. Nasir told Plaintiff that his "threats [were] wearing thin" and ordered him to fix the report to omit company and foundation donations. *Id*. Although Plaintiff made the changes that Nasir requested, he told her that he was uncomfortable doing so and it was against his better judgment, but he felt compelled to follow orders.

On March 28, 2017, the Museum terminated Plaintiff's employment. Prior to his termination, he did not receive any warnings, disciplinary actions, write-ups, or poor performance reviews.

On June 19, 2017, the Museum's Education and Public Programs Manager, Dimitra Georgouses ("Georgouses") sought an order of protection against Plaintiff in the Circuit Court of Cook County Domestic Violence Division, Case No. 17 OP 74063. The amended complaint alleges on information and belief that, prior to appearing in court on her petition, Georgouses told colleagues and/or supervisors at the Museum that Plaintiff was stalking her and sending her harassing, inappropriate text messages, calls, and voicemails and that Plaintiff had followed her boyfriend in his car for 18 miles. At the hearing on her petition, Georgouses told the court that she believed the Museum intended to use documents from her case in its own legal case against Plaintiff.

On June 21, 2017, the Museum's Director of Human Resources and Operations, Kristi Athas ("Athas"), informed the Museum's staff during an all-staff meeting that there was an active restraining order issued against Plaintiff and that Plaintiff had been stalking and sending inappropriate text messages, calls, and voicemails to a Museum employee and had followed

someone from the Museum in his car. Athas instructed staff to call the police if Plaintiff was spotted on Museum property.

In fact, a restraining order was never entered against Plaintiff. On August 7, 2017, Georgouses' motion for protective order was dismissed because she failed to appear for her hearing and abandoned her claims. Plaintiff denies ever stalking anyone or sending inappropriate text messages, calls, or voicemails to anyone, including Georgouses. Plaintiff also denies following anyone, including Georgouses' boyfriend, in his car for 18 miles.

Plaintiff filed suit against the Museum in Cook County Circuit Court on August 30, 2017. The case was removed to this Court on the basis of diversity jurisdiction. On June 21, 2018, the Court granted the Museum's motion to dismiss and gave Plaintiff until July 20, 2018 to file a first amended complaint to the extent that he could do so consistent with the Court's opinion. Plaintiff filed an amended complaint on July 17, 2018 [31]. The amended complaint adds a defamation *per se* claim against Georgouses, omits the Illinois Whistleblower Act claim that was alleged in the original complaint, and adds a number of factual allegations designed to address the pleading deficiencies noted in the Court's June 21 opinion.

Currently before the Court is the Museum's motion to dismiss Counts I and II of Plaintiff's amended complaint for failure to state a claim [36]. Georgouses has also filed a motion to dismiss Count III of the amended complaint [68], which will be resolved in a separate order.

## II. Legal Standard

A Rule 12(b)(6) motion challenges the legal sufficiency of the complaint. For purposes of a motion to dismiss under Rule 12(b)(6), the Court "'accept[s] as true all of the well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff.'" *Calderon-Ramirez*, 877 F.3d at 275 (quoting *Kubiak v. City of Chicago*, 810 F.3d 476, 480-81 (7th Cir. 2016)). To

survive a motion to dismiss under Rule 12(b)(6), a plaintiff's complaint must allege facts which, when taken as true, "'plausibly suggest that the plaintiff has a right to relief, raising that possibility above a speculative level.'" *Cochran v. Illinois State Toll Highway Auth.*, 828 F.3d 597, 599 (7th Cir. 2016) (quoting *EEOC v. Concentra Health Servs.*, 496 F.3d 773, 776 (7th Cir. 2007)). The Court reads the amended complaint and assesses its plausibility as a whole. See *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011).

### III. Analysis

#### A. Common Law Retaliatory Discharge

Illinois' tort of retaliatory discharge "'is an exception to the general rule that an at-will employment is terminable at any time for any or no cause.'" *Tolene v. T-Mobile, USA, Inc.*, 178 F. Supp. 3d 674, 686 (N.D. Ill. 2016) (quoting *Blount v. Stroud*, 904 N.E.2d 1, 9 (Ill. 2009)). To state a claim for retaliatory discharge, a Plaintiff must allege that he was "'(1) discharged; (2) in retaliation for [his] activities; and (3) that the discharge violates a clear mandate of public policy.'" *U.S. ex rel. Marshall v. Woodward, Inc.*, 812 F.3d 556, 564 (7th Cir. 2015) (quoting *Darchak v. City of Chicago Bd. of Ed.*, 580 F.3d 622, 628 (7th Cir. 2009)). While "[t]here is 'no precise definition of the term' public policy," the Illinois Supreme Court "has explained that it 'concerns what is right and just and what affects the citizens of the State collectively.'" *Gomez v. Garda CL Great Lakes, Inc.*, 76 F. Supp. 3d 788, 794-95 (N.D. Ill. 2014) (quoting *Palmateer v. Int'l Harvester Co.*, 421 N.E. 2d 876, 878 (Ill. 1981)). "Public policies are different from purely personal matters." *Id*. at 795 (internal quotation marks omitted). For instance, "the tort applies in situations where an employee is fired for refusing to violate a statute and not where a worker is fired over a disputed company policy." *Id*.

7

The identified public policy "must be found in the state's constitution, statutes or, where they are silent, in the judicial decisions of the state's courts." *Drager v. Village of Bellwood*, 969 F. Supp. 2d 971, 983 (N.D. Ill. 2013). "To survive a motion to dismiss," it is "not enough" to "cit[e] a constitutional or statutory provision"; instead, "the policy identified in the complaint must strike at the heart of a citizen's social rights, duties and responsibilities before a tort will be allowed, or involve the protection of each citizen's health and safety." *Id*. (internal quotation marks and citation omitted); see also *Long v. Commercial Carriers, Inc.*, 57 F.3d 592, 595 (7th Cir. 1995). In Illinois, "[i]t is widely recognized that the existence of a public policy, as well as the issue whether that policy is undermined by the employee's discharge, present[] questions of law for the court to resolve." *Turner v. Memorial Medical Center*, 911 N.E.2d 369, 374–75 (Ill. 2009); see also *Collins v. Bartlett Park Dist.*, 997 N.E.2d 821, 828 (Ill. App. 2013).

"The great majority of courts interpreting Illinois law hold that an employee who reports unlawful conduct to an employer is protected under the tort of retaliatory discharge," even if the conduct is not reported to law enforcement. *Belline v. K-Mart Corp.*, 940 F.2d 184, 187 (7th Cir. 1991); see also, e.g., *Van Pelt v. Bona-Dent, Inc.*, 2018 WL 2238788, at *8 (N.D. Ill. May 16, 2018) (denying motion to dismiss which was based on argument that plaintiff's "retaliatory discharge fails because he reported the illegal workers and odor of gas to his supervisor, rather than to a law enforcement agency"); *Spendal v. Illinois-American Water Co.*, 2013 WL 1285593, at *3 (N.D. Ill. Mar. 27, 2013) (denying motion to dismiss retaliatory discharge claim where plaintiff alleged that she was terminated in part because she reported that other employees were operating company vehicles under the influence of alcohol, in violation of Illinois law); *Corral v. UNO Charter School Network, Inc.*, 2013 WL 1855824, at *11 (N.D. Ill. May 1, 2013) (recognizing that "the 'citizen crime-fighter approach' has emerged as a common category of

8

retaliatory discharge claims"). This is because "public policy clearly favors the exposure of crime." *Belline*, 940 F.2d at 187.

The Court dismissed Plaintiff's original claim for retaliatory discharge because the complaint did not allege that Plaintiff told anyone at the Museum that he suspected that the Museum or its employees were violating state or federal law. The Court gave Plaintiff leave to file an amended complaint specifying what suspected "unlawful activities" he reported to Defendant and why such activities were unlawful, such that they would violate a clear mandate of public policy.

In his amended complaint, Plaintiff added several allegations to address this deficiency. Specifically, Plaintiff alleges that in September 2016, he informed Nasir and Adams that failure to use the IDNR grant money for its specified purpose would be illegal because the grant money falls under the GAAP and IRS category of "restricted funds," meaning it must be used for its specified purpose to comply with the law. Plaintiff stated that people go to jail for this type of conduct, particularly because money from the IDNR was, at least in part, taxpayer money. [31] at 3, ¶ 14. Plaintiff also alleges that in September 2016, he spoke with Nasir, Adams, and Armiros about the failure to use the donor money for the intended purpose of purchasing benches and stated that it was unlawful to spend earmarked donor money on unrelated projects and stressed that such conduct sends people to prison. The Museum once again moves to dismiss Plaintiff's retaliatory discharge claim on the basis that the complaint does not allege that Plaintiff reported allegedly unlawful conduct and that, even if Plaintiff did, the conduct alleged does not implicate public policy.

The Court concludes that the amended complaint contains sufficient allegations to state a plausible claim for retaliatory discharge. While Plaintiff has not identified any particular law that

9

the Museum or its employees violated (or that he suspected they violated), the Museum does not point to any case law requiring a plaintiff to do so in order to state a claim under the "citizen crime-fighter" category of retaliatory discharge claims. *Corral*, 2013 WL 1855824, at *11. To the contrary, "[t]o seek relief under this theory, [the plaintiff] need not prove that a criminal law was actually violated; it is enough that he had a good-faith belief that a crime had been committed when he made the report." *Id*. (citing *Belline v. K–Mart Corp*., 940 F.2d 184, 188 (7th Cir. 1991) ("That the questionable conduct may later prove to be authorized and therefore legitimate is not dispositive."); *Stebbings v. Univ. of Chicago*, 726 N.E.2d 1136, 1144 (Ill. App. 2000)). In other words, "[f]or purposes of Illinois law, all that matters is that when [Plaintiff] reported the conduct" to Nasir, Adams, and Armiros, he "reasonably believed the[] [Museum was] engaging in an unlawful or illegal act." *Tanzer v. Art Instutute of Chicago*, 2003 WL 21788850, at *3 (N.D. Ill. Aug. 1, 2003).

The two cases that the Museum cites in reply do not convince the Court that more is required. *In O'Regan v. Arbitration Forums, Inc.*, 121 F.3d 1060 (7th 1997), the Seventh Circuit affirmed the district court's dismissal of a retaliatory discharge claim on the basis that the plaintiff failed to adequately allege that she was discharged in retaliation for reporting to her employer that, among other things, the employer's president was claiming personal trips as business trips. *Id*. at 1064. While the Court stated in dicta that plaintiff's allegations contained "little *** that clearly suggests criminal tax violations," the Court did not decide whether the plaintiff adequately alleged a violation of criminal law or whether her termination violated Illinois public policy. Moreover, there is no indication from the opinion that the plaintiff told her employer that she believed that the president's actions were illegal. In *Williams v. Merle Pharmacy, Inc.*, 2015 WL 6143897 (C.D. Ill. Oct. 19, 2015), the district court dismissed a retaliatory discharge claim in which the plaintiff

claimed that she was terminated for reporting the potential financial exploitation of an elderly client, where the plaintiff failed to plead "anything from which one can plausibly conclude financial exploitation even took place" and "her allegations actually undermine[d] whether she held a good faith belief that criminality was afoot as she [alleged] that she told the elderly customer she was unable to say whether the [customer's] attorney was stealing the customer's money." *Id*. at *7. Here, by contrast, the amended complaint clearly alleges that Plaintiff told Nasir, Adams, and Armiros that the Museum's use of money for other than ear-marked purposes was illegal and that people go to jail for misusing donated funds. These allegations plausibly support Plaintiff's position that he had a good-faith belief that a crime was being committed when he spoke with Nasir, Adams, and Armiros. Compare *Tanzer*, 2003 WL 21788850, at *3–4 (denying motion to dismiss retaliatory discharge claim, where plaintiff alleged that she was terminated for failing to comply with museum employer's instruction to remove family members' names from donor wall, where the complaint alleged that the museum accepted gifts from family conditioned upon the family members' names being displayed on the donor wall and plaintiff believed the museum "would be committing a type of fraud" by removing the names without notifying the family).

Further, Plaintiff adequately alleges that his discharge in retaliation for reporting the misuse of donated funds violated a clear mandate of public policy. As outlined above, courts interpreting Illinois law have recognized the "citizen crime-fighter" category of retaliatory discharge claims because "public policy clearly favors the exposure of crime." *Belline*, 940 F.2d at 187. Contrary to the Museum's argument otherwise, Plaintiff's allegations do not merely concern issues of company policy or internal governance—they concern what Plaintiff allegedly believed to be criminal violations. Further, this Court has previously recognized that "Illinois may recognize a cause of action for an employee who reports corporate fraud or mismanagement" where the alleged

11

misdeeds that the discharged employee reported occurred in the State of Illinois, as Plaintiff alleges here. *Huang v. Fluidmesh Networks, LLC*, 2017 WL 3034672, at *7 (N.D. Ill. July 18, 2017) (citing *Johnson v. World Color Press, Inc.*, 147 Ill. App. 3d 746, 750-51 (1st Dist. 1986) (allowing a claim based on an employee's disagreement with accounting practices to go forward)). The Museum is an Illinois not-for-profit corporation, which presumably enjoys the tax benefits that status entails, and Plaintiff plausibly alleges that the allegedly misappropriated funds should have been used on projects in an Illinois museum.

For these reasons, the Museum's motion to dismiss Count I of the Amended Complaint is denied.

### B. Defamation *Per Se*

"An Illinois defamation action may state a claim either for defamation *per se* (statements so harmful to reputation that damages are presumed) or defamation *per quod* (statements requiring extrinsic facts to show their defamatory meaning)." *Muzikowski v. Paramount Pictures Corp.*, 322 F.3d 918, 924 (7th Cir. 2003). Plaintiff's claim is based on one of the "limited categories of statements or imputations that Illinois considers actionable *per se*": the "commission of a criminal offense." *Id*. (citing *Bryson v. News Am. Pub, Inc*., 672 N.E.2d 1207, 1214-15 (Ill. 1996)). "For a statement to constitute defamation *per se* as imputing the commission of a crime, the crime must be an indictable one, involving moral turpitude and punishable by death or imprisonment rather than by fine." *Doe ex rel. Doe v. Catholic Diocese of Rockford*, 38 N.E.3d 1239, 1251 (Ill. App. 2015).

The elements of a claim for either type of defamation are (1) the defendant made a false statement about the plaintiff; (2) the defendant made an unprivileged publication of that statement to a third party; and (3) that publication caused damages. *Doctor's Data, Inc. v. Barrett*, 170 F.

Supp. 3d 1087, 1102–03 (N.D. Ill. 2016). As to the first element, "[a] statement that is not technically true in every respect but is 'substantially true' does not constitute defamation; this is a question for trial unless no reasonable jury could find that substantial truth was not established." *Id*. at 1103-04 (citing *Global Relief Found., Inc. v. N.Y. Times Co.*, 390 F.3d 973, 982, 987 (7th Cir. 2004)).

"A defamatory statement is not actionable if it is privileged." *Dobias v. Oak Park & River Forest High School Dist. 200*, 57 N.E.3d 551, 572 (Ill. App. 2016). Qualified privilege is an affirmative defense that may be raised in a motion to dismiss if "the defense is apparent on the face of the complaint." *Id*. An allegedly defamatory statement is subject to a qualified privilege in "(1) situations in which some interest of the person who publishes the defamatory matter is involved," "(2) situations in which some interest of the person to whom the matter is published or of some other third person is involved," and "(3) situations in which a recognized interest of the public is concerned." *Kuwik v. Starmark Star Marketing & Admin., Inc.*, 619 N.E.2d 129, 135 (Ill. 1993) (citing the RESTATEMENT (SECOND) OF TORTS, § 5.25). A defendant "may not rely on [qualified] privilege if he abuses it." *Dobias*, 57 N.E.2d at 573. "A plaintiff claiming a defendant abused a qualified privilege must show a direct intention to injure another or a reckless disregard of the plaintiff's rights and of the consequences that may result to the plaintiff." *Id*. "Reckless disregard" means publishing the allegedly defamatory matter "despite a high degree of awareness of probable falsity or entertaining serious doubts as to its truth." *Kuwik*, 619 N.E.2d at 133 (internal citation and quotation marks omitted).

In its June 21 order, the Court dismissed Plaintiff's original defamation *per se* claim on the basis that Plaintiff did not allege that Athas' statement that he engaged in stalking was false. The Court did not resolve the Museum's alternative argument that Athas' statement was protected by

13

a qualified privilege, but acknowledged that "[f]rom the face of the complaint, it appears that Athas' allegedly defamatory statements might be protected by qualified privilege because the statements involved Athas' interest in maintaining the safety of Museum employees and the Museum staff's interest in a safe workplace." [30] at 12. The Court further explained that, "[a]s it stands, the complaint contains only bare-bones allegations that Defendant exceeded qualified privilege by 'ma[king] the false statements with an intent to injure Plaintiff and/or with reckless disregard for the truth.'" *Id.* at 13 (quoting [1-1] at 11). The Court advised that, "[i]n his amended complaint, Plaintiff should consider including any facts from which it could be inferred that Athas knew that Georgouses' claims of stalking were false or had 'a high degree of awareness of probable falsity" or "serious doubts as to [their] truth.'" *Id*. (citing *Kuwik*, 619 N.E.2d at 133).

In the amended complaint, Plaintiff alleges that he did not stalk or send inappropriate messages to Georgouses and that Athas' statement to the contrary was false, correcting the pleading deficiency identified in the Court's prior order. The Museum maintains, nonetheless, that the defamation claim should be dismissed because Athas' statement is subject to an innocent construction and was protected by qualified privilege. The "innocent construction" argument requires little discussion. Taking the pleadings as true, Athas clearly accused Plaintiff of engaging in stalking, a criminal offense. The Museum does not explain how this statement can be innocently construed or cite any applicable cases involving similar facts.

This leaves only the issue of whether Athas' statement was protected by a qualified privilege and, if so, whether she exceeded the scope of the privilege. "Whether a qualified privilege exists is a question of law for the court," whereas "[w]hether a privilege was abused is usually a question of fact for the jury." *Tamburo v. Dworkin*, 974 F. Supp. 2d 1199, 1214 (N.D. Ill. 2013) (citing *Kuwik*, 619 N.E.2d at 135). "'However, just because an issue is generally one

14

for a trier of fact to resolve does not mean that a defamation plaintiff is automatically entitled to present his case to a jury when a qualified privilege applies. A court may determine that as a matter of law insufficient facts are alleged *** to show an abuse of the applicable qualified privilege.'" *Id.* (quoting *Huon v. Beatty*, 2011 WL 9717454, at *6 (Ill. App. 2011)).

The Court concludes based on the pleadings that a qualified privilege does exist, but that Plaintiff has alleged sufficient facts to plausibly support his position that the qualified privilege has been abused. Absent abuse of qualified privilege, Athas' statement to Museum employees that Plaintiff stalked and sent harassing messages to Georgouses would be subject to qualified privilege given the alleged context in which the statements were made. Athas was the Museum's Director of Human Resources. The all-staff meeting in which she made the allegedly defamatory statement occurred just two days after Georgouses sought an order of protection against Plaintiff. According to the complaint, Georgouses told colleagues and/or supervisors at the museum about Plaintiff's alleged stalking and harassment. Athas obviously was informed about the allegations and Georgouses' attempt to obtain a protective order because she told staff members. Athas, as the employee in charge of human resources, clearly had an interest in maintaining the safety of Museum employees. And her audience, the Museum staff, clearly had an interest in working in a safe place. Athas' statement that staff should call the police if Plaintiff was spotted on the Museum campus reflects her concern in protecting those interests. Compare *Haywood v. Lucent Technologies, Inc.*, 169 F. Supp. 2d 890, 917 (N.D. Ill. 2001) (qualified privilege applied to alleged statements by manager and supervisors to security to contact police if terminated employee appeared in parking lot because employer, security staff, and other employees had "a compelling interest—even a duty—in knowing whether [the former employee] was no longer employed by the company and no longer allowed on the premises").

15

Nonetheless, Plaintiff has alleged facts that, considered in the light most favorable to him, plausibly suggest that Athas may have known that Georgouses' accusations were false or may have entertained serious doubts as to the truth of the accusations. Plaintiff takes the position that Athas' statements were made not to protect Museum employees, but in anticipation of litigation to bolster the Museum's defense to Plaintiff's soon-to-be filed retaliatory discharge claims. In support, Plaintiff points to the suspicious timing of key events. The Museum terminated Plaintiff in late March 2017. On May 10, 2017, Plaintiff issued a pre-suit demand letter to Nasir. The Museum's response to the demand letter was due June 21. On June 19, Georgouses appeared in Court seeking the protective order against Plaintiff. A transcript of the hearing, which Plaintiff attaches to his response to the motion to dismiss, shows that Georgouses informed the court that Plaintiff was suing the Museum and that the Museum intended "to use paperwork from here in association with the cease and desist" letter that the Museum planned to send Plaintiff in response to his demand. [45] at 14. Based on these facts, it is plausible that the Museum and Athas had communicated with Georgouses about Plaintiff's alleged stalking and knew that Georgouses' accusations were false or had serious doubts about their truth, but went along with the story to provide the Museum with a defense to Plaintiff's threatened litigation. These issues cannot be resolved based on the pleadings and therefore the Museum's motion to dismiss Count II of the Amended Complaint is denied.

**IV.     Conclusion**

For these reasons, the Museum's motion to dismiss Counts I and II of Plaintiff's amended complaint for failure to state a claim [36] is denied.  This case is set for status hearing on February 13, 2019 at 9:00 a.m.


Dated: February 4, 2019

_____
Robert M. Dow, Jr.
United States District Judge